SO ORDERED: September 16, 2016.



_____
James M. Carr
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| CHANDA DARLEEN SMITH, ) | Case No. 14-08813-JMC-7 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| STATE OF INDIANA on the relation of the ) | |
| INDIANA DEPARTMENT OF ) | |
| WORKFORCE DEVELOPMENT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 15-50002 |
| ) | |
| CHANDA SMITH, ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on June 13, 2016.  Plaintiff State of Indiana on the relation of the Indiana Department of Workforce Development ("DWD") appeared by counsel Maricel E.V. Skiles and Spencer Tanner.  Defendant Chanda Smith

("Smith") appeared by counsel Jeffrey A. Hokanson and Cathleen D. Wyatt. At the conclusion of the trial, the Court took the matter under advisement and invited DWD to file a post-trial brief on or before July 13, 2016 and Smith to file a post-trial brief within 14 days thereafter.

The Court, having reviewed the evidence presented at the trial, the *Brief in Support of Position* filed by DWD on June 8, 2016 (Docket No. 27), the *Brief on Behalf of Defendant Chanda Smith* filed by Smith on June 13, 2016 (Docket No. 28), the *Post-Trial Brief in Support of Position* filed by DWD on July 13, 2016 (Docket No. 34) ("DWD's Brief"), and *Defendant's Post-Trial Brief* filed by Smith on July 27, 2016 (Docket No. 35) ("Debtor's Brief"), and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

### Findings of Fact

The Court makes the following findings of fact:

1. On September 22, 2014, Smith filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[1] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

2. On January 23, 2015, Smith received her general discharge.

3. On January 5, 2015, DWD timely filed the *Complaint to Determine Dischargeability of Debt* (Docket No. 1) (the "Complaint"), wherein DWD alleges that Smith owes a Debt (as defined below) to DWD that is nondischargeable under §§ 523(a)(2)(A) and/or (a)(7).

---

[1] All statutory references herein are to the Bankruptcy Code unless otherwise noted.

4. On June 3, 2015, upon application by DWD (Docket No. 5), the Clerk of the Bankruptcy Court entered a default against Smith because Smith had failed to plead or otherwise defend this adversary proceeding by the February 4, 2015 answer deadline (Docket No. 6).

5. On June 10, 2015, DWD filed a *Motion for Default Judgment* (Docket No. 8). At the July 15, 2015 hearing on such motion, Smith appeared *pro se*. The Court deemed Smith's averments on the record to be her answer denying all allegations of the Complaint regarding her intent to deceive and denied the *Motion for Default Judgment* (Docket No. 15).

6. Because this adversary proceeding is being resolved on the merits, the Court entered an *Order Setting Aside Clerk's Entry of Default* on September 16, 2016 (Docket No. 36).

7. From January 2007 to March 2009, Smith worked for M Group, a small property management company for homeowners' associations including Heartland Crossing in Camby, Indiana. Smith worked as a property manager enforcing the covenants and restrictions of eleven communities, earning approximately $25,000 per year. Her employment contract with M Group provided that she would receive severance in the amount of one year's salary if she were terminated.

8. When the largest builder in Heartland Crossing terminated normal operations, M Group experienced a "massive slow down" and terminated Smith's employment. M Group represented to Smith that it could not afford to pay Smith one year's salary as severance, so M Group told Smith to file for unemployment benefits for two years and M Group would not protest those payments (the "New Severance Agreement"). M Group sent Smith an email confirming the New Severance Agreement, but a copy of that email was destroyed in a November 2009 fire at the house Smith was renting.

9. In April 2009, Smith went to DWD's Work One office located near the intersection of 10th Street and Beechwood in Indianapolis and applied for unemployment benefits. She had not filed for unemployment benefits before, though Smith had previously applied to the State of Indiana for Medicaid benefits. Smith did not receive a copy of the unemployment insurance claimant handbook, but she did ask several questions of the Work One staff.

10. Smith's initial application for unemployment benefits was denied. Smith called the Work One office and was told by a female customer service representative that M Group had not paid sufficient sums into its unemployment insurance account and thus Smith's application was denied. Smith told the customer service representative about the New Severance Agreement, and the customer service representative suggested Smith appeal the denial of benefits. Smith followed that advice, believing she was entitled to unemployment benefits under the New Severance Agreement.

11. The appeal was successful and Smith began receiving unemployment benefits in 2009 via a debit card issued by DWD. Those benefits stopped before Christmas 2009.[2]

12. Panicking, Smith found a part-time teller job at PNC Bank and a part-time kitchen job at Roland Manor in January 2010.

13. Later, DWD sent Smith a letter stating that Smith might be eligible for extended unemployment benefits. Smith went to the Work One office to apply for such benefits, even though she was working at her two part-time jobs, on the belief that such benefits were a continuation of her severance pursuant to the New Severance Agreement. Smith disclosed to the

---

[2] DWD does not allege that the unemployment benefits Smith received in 2009 were wrongly received.

Work One customer service representative(s) that she was working part-time. Such application was approved, and Smith again began receiving benefits.

14. Smith submitted a weekly voucher in order to obtain the benefits. As part of that online process, Smith said "no" each time she was asked if she worked that week. All told, Smith answered "no" approximately 47 times when she was actually working and being paid for her part-time work. Smith testified she was directed by a male customer service representative at the Work One office to "keep clicking no" when filing the weekly vouchers.

15. Smith testified that she was not trying to defraud the State of Indiana by collecting unemployment benefits. Rather, she was trying to collect the severance due pursuant to the New Severance Agreement.

16. All testimony regarding the conversations with and the directions given to Smith by Work One customer service representatives and Smith's state of mind is unrebutted.

17. DWD conducted a fraud investigation with respect to Smith's unemployment insurance claims. According to the fax headers on Exhibits 4 and 5, Roland Manor and PNC Bank confirmed in writing to DWD in June 2011 and May 2011, respectively, that they paid wages to Smith in 2010. The two Investigation Case Histories were not dated until December 2012 and February 2013, and it was not until March 1, 2013 that DWD sent to Smith (at the wrong address) two "Determination of Eligibility" letters and four "Notice of Potential Overpayment" documents, notifying Smith that she had received benefits in error and was liable to repay them along with penalties and interest.

18. DWD calculates the total overpayment including penalties to be $21,278 (the "Debt"). Smith's appeal of the overpayment determination through DWD's administrative appeals process was denied as untimely.

**Conclusions of Law**

1. Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

3. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4. Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

5. Exceptions to discharge under § 523 "are to be [construed] strictly against a creditor and liberally in favor of the debtor." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)). "The burden is on the objecting creditor to prove exceptions to discharge." *Id.* (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

*§ 523(a)(2)(A)*

6. Section 523(a) provides, in relevant part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt –
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> > (A) false pretenses, a false representation, or actual fraud … .

7. The Seventh Circuit has noted material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." *See Rae v.*

*Scarpello (In re Scarpello)*, 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)).

8. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" theories, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

9. "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.'" *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (quoting *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 959 (Bankr. N.D. Ill. 1995) (internal quotations omitted)). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928 (citation omitted).

10. A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.* (citing *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). "An intentional falsehood relied on

under § 523(a)(2)(A) must concern a material fact." *Scarpello*, 272 B.R. at 700 (citing *Jairath*, 259 B.R. at 314).

11.     Justifiable reliance is an intermediate level of reliance which is less stringent than "reasonable reliance" but more stringent than "reliance in fact." *See Field v. Mans*, 516 U.S. 59, 72-73, 116 S.Ct. 437, 445, 133 L.Ed.2d 351 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id.* at 71 (quotations omitted). Justifiable reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id.* (quotation omitted).

12.     A debtor's intent to deceive for purposes of the false pretenses and false representation prongs on § 523(a)(2)(A) "is measured by a debtor's subjective intention at the time the representation was made." *Scarpello*, 272 B.R. at 700 (citing *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)). "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." *Hanson*, 432 B.R. at 773 (internal citations omitted).

13.     "[A]ctual fraud is broader than misrepresentation," *McClellan*, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability for "actual fraud." *Scarpello*, 272 B.R. at 700 (citing *McClellan*, 217 F.3d at 894). "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217

F.3d at 893 (internal citations omitted). *See also Husky Int'l Elec., Inc. v. Ritz*, -- U.S. --, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.' ") (quotation omitted). In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute." *Hanson*, 432 B.R. at 772 (citing *McClellan*, 217 F.3d at 894).

14. "[T]he focus of an 'actual fraud' claim is on the defendant's state of mind at the time of his purportedly fraudulent conduct." *Merritt v. Wiszniewski (In re Wiszniewski)*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. 2010) (citation omitted).

15. Smith candidly admitted at the trial that she was working part-time when she represented to DWD that she was not when submitting her weekly vouchers. DWD reasonably relied on those representations in awarding Smith unemployment benefits. Therefore, the only question, under any of the three prongs of § 523(a)(2)(A), is whether Smith intended to deceive DWD.

16. Factually speaking, weighing in Smith's favor is her credible and unrebutted testimony with regard to (a) her intent, (b) the existence of the New Severance Agreement and her belief that it entitled her to unemployment benefits regardless of any later-existing employment status, (c) her disclosure of the New Severance Agreement to DWD's Work One customer service representative(s), (d) her disclosure of her part-time jobs to DWD's Work One customer service representative(s), and (e) the instructions Smith received from DWD's Work One customer service representative(s) and followed with respect to "clicking no."

17.     Weighing in DWD's favor is that (a) Smith represented that she was not working approximately 47 times when she was in fact working, and (b) Smith was familiar with State of Indiana benefit application processes.

18.     In DWD's Brief, DWD suggests that "[Smith] did not list the employment because she was aware that she would not receive the benefits if she was honest." There is no evidence in the record regarding Smith's "awareness" to support such an assertion. In addition, DWD's reliance on *Ohio Dep't of Job & Family Serv. v. Yuppa (In re Yuppa)*, 2013 WL 4854479 (Bankr. S.D. Ohio 2013) is distinguishable.[3] While that court found that debtor's course of conduct (ten false certifications) "provide[d] the totality of circumstances through which an intent to deceive may be inferred" (*Id.* at *4), the matter was resolved at the summary judgment stage where that debtor did not present any evidence with regard to her intent. Here, Smith offered credible testimony which was unrebutted as to her reasons for "clicking no" 47 times – her desire to collect severance under the New Severance Agreement and her following the directions of DWD's Work One representative(s).

19.     While fraudulent intent can be inferred from the surrounding circumstances (*Hanson*, 432 B.R. at 773), Smith has rebutted such inference with credible, uncontroverted evidence. The reasons she offered were plausible and coherent, and her description of events was internally consistent. The Court concludes that in this instance Smith did not intend to

---

[3]     Similarly unpersuasive are DWD's citations to *State of Colorado v. O'Brien (In re O'Brien)*, 110 B.R. 27, 31-32 (Bankr. D. Colo. 1990), where that court found the debtor's testimony to be implausible and unbelievable; *Arizona Dep't of Econ. Sec. v. Kaliff (In re Kaliff)*, 2 B.R 465, 468 (Bankr. D. Ariz. 1979), where that court found that the debtor had actual knowledge as to the questionable status of debtor's receiving unemployment compensation at the same time he was receiving paychecks from a union; *Lucas County Dep't of Job & Family Serv. v. Perrin (In re Perrin)*, 2013 WL 509130 at *7 (Bankr. N.D. Ohio 2013), a decision regarding the overpayment of food assistance benefits, where that court found that the debtor's intent was preclusively established in a different proceeding; and *Minnesota Dep't of Emp't and Econ. Dev. v. Sanderson (In re Sanderson)*, 509 B.R. 206, 210 (Bankr. W.D. Wisc. 2014), where the debtor's answer conceded the issue of intent.

deceive DWD.  Was she wrong to click no?  Absolutely.  Did Smith intend to deceive DWD by clicking no?  Not according to the evidence presented.

20.     DWD has failed to meet its burden to prove that the Debt should be excepted from discharge pursuant to § 523(a)(2).  Therefore, the Court concludes that the non-penalty portion of the Debt ($16,192) is not excepted from discharge pursuant to § 523(a)(2)(A).

## *§ 523(a)(7)*

21.     A debt is not dischargeable pursuant to § 523(a)(7) "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss… ."

22.     There was no dispute at trial regarding DWD's claim that the penalties it imposed against Smith pursuant to Ind. Code § 22-4-13-1.1(b) are excepted from discharge pursuant to § 523(a)(7).  Smith's arguments in Debtor's Brief are unpersuasive, and any challenge to the imposition of penalties in this Court is improper as any such challenge would have had to have been made via an appeal of DWD's determination.

23.     The Court notes that there is no intent element in determining whether a penalty is excepted from discharge pursuant to § 523(a)(7).  Therefore, the fact that the Debt contains penalties payable to and for the benefit of DWD, a governmental unit, which are not compensation for actual pecuniary loss is sufficient to satisfy § 523(a)(7).

24.     Therefore, the Court concludes that the penalty portion of the Debt ($5,086) is excepted from discharge pursuant to § 523(a)(7).

## **Conclusion**

Based on the foregoing, the Court hereby concludes that:

A. The non-penalty portion of the Debt is not excepted from discharge pursuant to § 523(a)(2)(A).

B. The penalty portion of the Debt is excepted from discharge pursuant to § 523(a)(7).

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #